The Friedlander Corporation v. Commissioner.
Friedlander Corp. v. Commissioner
Docket No. 2053.
United States Tax Court
1945 Tax Ct. Memo LEXIS 160; 4 T.C.M. (CCH) 652; T.C.M. (RIA) 45231; June 18, 1945
*160 Waldo DeLoache, Esq. and J. O. Gibson, Esq., for the petitioner. Bernard D. Hathcock, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's income tax for the calendar years 1940 and 1941, and in petitioner's declared value excess profits tax and excess profits tax for the calendar year 1941, as follows: Income Tax
Liability
Assessed
Deficiency
1940
$ 1,730.37
None
$1,730.37
1941
10,466.84
$ 6,517.68
3,949.16
TOTAL
$12,197.21
$ 6,517.68
$5,679.53
Declared
Value Excess
Profits Tax
1941
$ 1,669.35
$ 382.01
$1,287.34
Excess
Profits Tax
1941
$ 6,632.15
$ 3,761.32
$2,870.83
TOTAL
$20,498.71
$10,661.01
$9,837.70
The petition assigned five errors as to the foregoing determination, all of which were abandoned at the hearing, except the issue raised with respect to respondent's determination for the calendar year 1941, that The bonuses of $2,000.00 each paid to Max and Irwin Friedlander, sons of the president of the corporation, have been disallowed as proper deductions from income. Findings of Fact The petitioner is a corporation organized in *161 1928 under the laws of the State of Georgia, with its principal office at 27-31 First Street,moultrie, Georgia. It filed its tax returns for the years involved, with the collector for the district of Georgia. Petitioner in the taxable year 1941 was engaged in the general merchandise business started in 1909 and operated by its unincorporated predecessor from 1909 to 1928 when petitioner took over the operations. It operates eleven stores altogether in various towns in South Georgia. The main store is at Moultrie, Georgia, occupying a building 103 feet by 145 feet with two full floors and a 40 foot mezzanine floor, and has about 17 departments. The store building was erected in 1935. Moultrie, Georgia had a population of about 10,000 or 12,000 people in 1941. Louis Friedlander and his brother-in-law, I. B. Pearlman, were the president and vice-president, respectively, of petitioner. Louis Friedlander had been president since petitioner's organization, and had been connected with the business through petitioner's predecessor since 1909. I. B. Pearlman had been in the business about twenty-five years and was paid a regular salary in 1940 and 1941 of about $8,000 per annum. He was *162 principally engaged in looking after the out-of-town stores. Petitioner's stock was controlled by these two men and their families. Louis Friedlander owned 350 shares of the 1,250 shares outstanding. His six sons owned 750 shares between them which had been given them by their father. One of petitioner's store managers owned about 10 shares. Irwin Friedlander, the oldest son of Louis Friedlander, was 25 years old in June 1941. He began assisting in the Moultrie store on Saturdays, after school, and in vacation, when he was about nine or ten years old by running errands and helping out in various places in the store during busy times. He graduated from high school in Moultrie at the age of about 17 as valedictorian of his class. He then went to Duke University, but continued to work in the store during vacations. He took the course in business administration in that University, graduated second in his class magna cum laude, and was offered a scholarship to come back after graduation. After his graduation, however, he went to New York with the idea of entering the training school operated by the R. H. Macy Department Store to obtain training in modern merchandising. He succeeded *163 in entering the training school of one of Macy's branch stores, Bambergers, in Newark, New Jersey. He started at $25 a week as a basement stock boy. All of the students in the training school start out and work as stock boys while taking the training course. He was shortly promoted to assistant buyer in the basement at $35 a week. He remained with Bambergers about a year, then left to work for a resident buying office in New York. He entered the employ of petitioner in January or February 1940 and was placed in charge of the dry goods department which was a very large department. In this department he had from six to twenty clerks working under him, depending on the time of year. He started at a salary of $150 a month. He installed and took charge of a ready-to-wear department located next to the dry goods department. His salary was increased to $200 a month in about May 1941. In 1941 he finally had complete charge of the dry goods and ready-to-wear departments and the floor upon which they were located including two or three other departments, and made several buying trips to New York. During that year he was in charge of all the employees of the entire store, hiring and discharging *164 same when necessary, and held promotional and pep meetings with them. The early connection of Max Friedlander, another son of Louis Friedlander, with the business as a boy was similar to that outlined as to his brother, Irwin. He graduated second in his class in the Moultrie High School and also took the course in business administration at Duke University. After graduation in 1940 and in August of that year he returned home and began working in the store. At the start he was paid a salary of $100 a month which continued through the first seven months in 1941 when it was increased to $125 a month, and three months later was increased to $150 a month. Max had charge of the men's department. He had charge also of two or three other departments. He did all the buying of men's clothing and furnishings, except shoes, and helped do the buying of the shoes. He made buying trips to New York. Louis Friedlander and I. B. Pearlman supervised the other departments in the store. Each of petitioner's out-of-town stores had a manager in charge, each of whom was paid a salary and most of whom were paid a salary and commission on sales which varied in totals between $200 and $225 a month. All *165 the employees of petitioner receive a small Christmas bonus. Petitioner's president, Louis Friedlander, broke his arm while riding horseback September 10, 1941. After about a month it appeared that he might lose his hand so he went to Atlanta for treatment, remaining there the balance of the year, except for a week or two at Christmas. Since the accident he had no contact with business affairs either by phone or correspondence. On one occasion his son Max tried to see him in the hospital on an important matter, but he wasn't in condition to talk about it. Petitioner's heavy business period begins in August when the tobacco market opens and continues through Christmas. There was an increase in business during this period in 1941 due to the construction of an Army camp at Moultrie. The absence of petitioner's president as a result of his injury greatly increased the duties and responsibilities of his two sons, Irwin and Max, who together carried on the functions formerly performed by the president in the business. When Louis Friedlander returned from Atlanta at Christmas time and after discussing the situation with his sons, it was decided to pay them a special bonus, as additional *166 compensation, of $2,000 each, which was paid on December 29, 1941. Similar bonuses were also paid petitioner's president and vice-president. Neither Irwin nor Max was an officer of the corporation. Both subsequently went into the Navy, Irwin holding a commission as Ensign, and Max as a Lieutenant (j.g.). The total volume of business done by petitioner's eleven stores in 1941 was about $1,200,000, of which about $750,000 was produced by the Moultrie store. According to the deficiency notice, petitioner's net income for the taxable year ended December 31, 1941, as disclosed by its return, was $30,888.07, and as adjusted by respondent was $44,021.58. According to that notice its invested capital as disclosed by that return was $225,747.25 and as adjusted by respondent was $237,734.86. The additional payments of $2,000 each to Irwin and Max Friedlander, made near the end of the year 1941, which payments increased their total compensation for the year to $4,402.53 for Irwin and $3,501.26 for Max, consituted reasonable compensation for personal services actually rendered by them to petitioner. Opinion TYSON, Judge: Respondent contends: (1) that the evidence fails to establish that *167 the services rendered by Irwin and Max Friedlander were worth more than the amounts of their regular salaries for 1941, i.e., approximately $2,150 and $1,375, respectively, and that consequently the payment of the extra $2,000 to each was to that extent excessive and unreasonable; and (2) that such payments of $2,000 "do not in fact represent compensation for services" but were "distributions of corporate profits." Irwin Friedlander was paid a total compensation during the taxable year of $4,402.53 and Max Friedlander was paid a total compensation of $3,501.26 in that year, both amounts inclusive of the $2,000 extra payment made near the end of the year. The record discloses a total compensation in the respective amounts of $4,150 and $3,375, but the larger amounts as first above stated are conceded on petitioner's brief. The discrepancies in figures are apparently represented by the amount of Irwin's and Max's shares in the customary Christmas bonuses given to all petitioner's employees. Both Irwin and Max were of exceptional intelligence and especially well equipped for their positions by reason of their high school education and their education in business administration at Duke *168 University; and, in Irwin's case, special education in modern merchandising under the Macy Training School System. Both Irwin and Max had begun participating in the Moultrie store's activities after school hours and in vacations at the age of 10 years. In the taxable year Irwin was in complete charge of one of petitioner's main floors including four or five departments and was also in charge of all the employees of the store, hiring and discharging same when necessary. He also made several buying trips to New York. Max had charge of the men's department and did all the buying of men's clothing and furnishings, except shoes, and assisted in buying them. He also had charge of two or three other departments. He also made New York buying trips. Louis Friedlander and I. B. Pearlman, president and vice-president, respectively, had charge of the departments other than those in charge of Irwin and Max Friedlander. The accident to their father in September 1941, by preventing him from further performing his customary managerial duties over the store, thrust heavy additional burdens on both Irwin and Max, who together thereafter throughout the taxable year performed those of the managerial functions *169 formerly performed by their father in the business. The period during which they performed those functions was the busiest period of the year and was extraordinarily so due to the construction of an Army Camp at Moultrie at that time. The Moultrie store had achieved a year's volume of business of about $750,000, whereas, the total volume for all eleven of petitioner's stores was about $1,200,000. Petitioner's net income for the year, as adjusted by respondent, was $44,021.58. Louis Friedlander testified that petitioner could not have employed other persons to render the services rendered by Irwin and Max for the amounts paid them in 1941, including the extra $2,000 to each. The testimony was uncontradicted. We have no reason to doubt the truth of such testimony given by one, who although the father of Irwin and Max and president of petitioner, was qualified through his long experience in merchandising to pass on such a question; especially in view of the facts shown herein which of themselves would, in our opinion, sustain a holding that such amounts constituted reasonable compensation for the services rendered by Irwin and Max. We think that respondent's first contention, that *170 the evidence fails to establish that the extra $2,000 compensation paid to Irwin and Max Friedlander constituted reasonable compensation for services rendered, is untenable. We are of the opinion that under all the circumstances the total payments received by them during 1941, including the $2,000 additional payments, were reasonable compensation for personal services actually rendered to petitioner by Irwin and Max Friedlander. Having decided that the amounts of $2,000 paid to each Irwin and Max when added to the other compensation received by them were reasonable for the services performed by them respectively in the taxable year, we will consider the second contention of respondent, that those payments constituted distributions of corporate profits rather than compensation for their services. In support of his second contention respondent points out that regular Christmas bonuses had been paid all petitioner's employees, including Irwin and Max, and the extra $2,000 paid the latter and the president and vice-president of petitioner was paid only to parties who were stockholders and not to other store managers or department heads. Our findings show that there were no department *171 heads who were not paid the extra $2,000. As to the managers of the stores other than that at Moultrie, the evidence shows that none of such managers was called upon to render any additional services or to assume any new responsibilities such as were required of Irwin and Max in 1941, and the managers of the branch stores, all ten of which did much less gross business than the Moultrie store alone, received regular annual compensation in excess of the regular compensations received by either Irwin or Max not including the $2,000 to each. In our opinion, the fact that Irwin and Max happened to be stockholders was incidental. The payments were made not "because they were stockholders, but because they all performed services * * * peculiarly valuable." Benz Brothers Co., 20 B.T.A. 1214, 1222. Neither the four brothers of Irwin and Max nor the manager of one of the branch stores, all of whom were stockholders, received any payments of the character of those here involved, the only stockholders receiving such payments as additional compensation being Irwin, Max, and the president and vice-president of petitioner. While it is not shown definitely in the record what were the *172 relative proportions of shares owned by the president, the vice-president, and Irwin and Max, so that it could be determined with accuracy whether the extra $2,000 payment received by each was in proportion to the shares held by each, such determination is inconsequential, since even if the extra payments received by these four had been on a stockholding ratio it would have no adverse effect where, as we have held here, the extra $2,000 paid each Irwin and Max was reasonable compensation for services actually rendered by each of them to petitioner. Cf. New York Talking Machine Co. et al., 13 B.T.A. 154The Wickens Co., 16 B.T.A. 968; and Benz Brothers Co., supra. Respondent also suggests in support of his second contention, that the extra payments were not decided upon until near the close of the year and after it was apparent the business had prospered. This is of no significance under the circumstances here present, which show that there was a rendition of services and that the payments therefor were reasonable in amount. Cf. Heywood Boot & Shoe Co., 76 Fed. (2d) 586; Katz & Besthoff, Ltd., 5 B.T.A. 750; L. Friedman Neckwear Corporation, 15 B.T.A. 61; *173 Guarantee Liquid Measure Co., 20 B.T.A. 758; Orange Securities Corporation, 45 B.T.A. 24. The second contention of respondent to the effect, that the amounts paid Irwin and Max Friedlander were distributions of corporate profits and did not represent compensation for services, is untenable. We hold that the amount of $2,000 paid each, Irwin and Max Friedlander, by petitioner, totally $4,000 to both, was reasonable compensation for personal services actually rendered by them and that respondent's disallowance of the $4,000 as deductions from petitioner's gross income was in error. Decision will be entered under Rule 50.